1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

KENDALL BRILL & KELLY LLP
Bert H. Deixler (70614)
   bdeixler@kbkfirm.com
Nicholas F. Daum (236155)
   ndaum@kbkfirm.com
Nary Kim (293639)
   nkim@kbkfirm.com
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile:  310.556.2705

Attorneys for Plaintiff The Regents of the
University of California

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

THE REGENTS OF THE
UNIVERSITY OF CALIFORNIA, ON
BEHALF OF THE DEPARTMENT OF
INTERCOLLEGIATE ATHLETICS
ON ITS LOS ANGELES CAMPUS,

              Plaintiff,

       v.

UNDER ARMOUR, INC.,

              Defendant.

Case No. 2:20-cv-07798

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Plaintiff The Regents of the University of California, on behalf of the Department of Intercollegiate Athletics on its Los Angeles Campus ("UCLA"), for its complaint against Under Armour, Inc. ("Under Armour"), alleges as follows:

## **NATURE OF THE ACTION**

1.      In 2016, Under Armour and UCLA signed the largest athletic apparel sponsorship deal in the history of American college sports.  By 2020, Under Armour wanted to get out of that deal—not because of anything UCLA did, but because the deal now seemed too expensive for the financially-troubled sportswear company.  Under Armour decided that it would use the COVID-19 pandemic as a pretext to "terminate" the sponsorship agreement.  But neither the governing agreement nor the law allows Under Armour to do so.  This action seeks to hold Under Armour to the promises that it made.

2.      In the 2016 sponsorship agreement (the "Agreement"), Under Armour promised to provide UCLA with at least $280 million in financial support— consisting of monetary payments and products—over the Agreement's fifteen-year term.  UCLA, in return, promised that its student-athletes and personnel would wear and use Under Armour-supplied products, on an exclusive basis, and provide Under Armour with certain other perks.  UCLA lived up to its end of the bargain.

3.      Nevertheless, in June 2020, Under Armour decided that it wanted out.  Following years of declining business, Under Armour's corporate leadership apparently decided that the UCLA deal was over-market and too expensive for a troubled company.  Under Armour decided to try to use the COVID-19 pandemic as a cover to get out of paying on a deal that it no longer wanted to be in.  It purported to terminate the Agreement, pointing in the vague direction of COVID-19.

4.      Under Armour is simply wrong about the Agreement and the governing law.  The Agreement sets forth the exact circumstances in which Under Armour may terminate the Agreement.  None of these circumstances is present here.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

5.      Under Armour is perfectly capable of providing the products that it promised to provide, and making the payments that it promised to pay.  Under Armour, in fact, has intermittently provided some of the promised products during the COVID-19 pandemic, though it has intentionally withheld others and delayed deliveries in an effort to cause more harm to UCLA.  Neither "force majeure" from the COVID-19 pandemic, nor any other circumstance, makes it impossible for Under Armour to perform its obligations.  Under Armour simply has decided that, as a matter of economics, it does not want to do so.

6.      As such, UCLA brings this action for damages to hold Under Armour accountable for breaching its commitment to UCLA and to recover the full value of the rights and benefits that UCLA is entitled to under the Agreement.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.  In particular, diversity of citizenship exists because Plaintiff is a citizen of California and Defendant is a citizen of Maryland.  The amount in controversy exceeds $200,000,000.00.

8.      This Court has personal jurisdiction over Defendant, including because it has solicited and entered into a contract with Plaintiff in this State and District; a substantial part of the events or omissions giving rise to the claims has occurred and continues to occur in this State and District; and Defendant is registered to and systematically and continuously does conduct business in this State and District.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), including because a substantial part of the events or omissions giving rise to the claims has occurred and continues to occur in this District, and because the Agreement at issue in this action was largely negotiated in this District.

## THE PARTIES

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

10.     Plaintiff The Regents of the University of California is a California constitutional corporation, authorized and empowered to administer a public trust known as the University of California, with full powers of organization and government thereof, including all powers necessary or convenient for the effective administration of the trust.  The Regents maintains a campus in the County of Los Angeles known as the University of California, Los Angeles.  It brings this Complaint on behalf the Department of Intercollegiate Athletics on its Los Angeles Campus ("UCLA").

11.     On information and belief, Defendant Under Armour, Inc. ("Under Armour") is a corporation organized and existing under the laws of Maryland with its principal place of business in Baltimore, Maryland.  Under Armour markets, distributes, offers for sale, and sells its products throughout the United States, including in this District, through its online store and through retail stores located in this District.

### THE FACTS

12.     NCAA Division I schools that compete at the highest level of intercollegiate athletics—like UCLA—have long been the target of lucrative apparel and equipment deals from sportswear companies.  In addition to competing for endorsement deals with celebrity athletes and professional sports teams, sportswear companies like Under Armour, Nike, and Adidas regularly try to outbid each other to become the official "sponsor" of elite collegiate sports programs.

13.     In the mid-2010s, part of Under Armour's corporate strategy was to outbid its rival sportswear companies for exclusive sponsorship deals with elite NCAA Division I schools.  On information and belief, in January 2014, Under Armour signed a record-setting, ten-year sponsorship deal with the University of Notre Dame for $90 million.  Under Armour quickly followed up on its Notre Dame deal with an even bigger deal with the University of Wisconsin, with whom Under

Kendall Brill & Kelly LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Armour negotiated a ten-year agreement worth $96 million.

14.     Prior to the Under Armour deal, UCLA's student-athletes and sports staff had been sponsored and outfitted by Under Armour's rival brand, Adidas. However, with the Adidas deal ending, Under Armour saw an opportunity to score a deal with UCLA.

15.     Consistent with its then-strategy (since changed by new management), Under Armour launched an aggressive campaign to convince UCLA to choose Under Armour as its next sponsor, over of its rival brands, by offering UCLA an unprecedented fifteen-year sponsorship worth upwards of $280 million.

16.     This was not only the most expensive exclusive college sponsorship deal that Under Armour entered into—it was the most lucrative college sponsorship deal by any sportswear company in history.  It bested, for instance, the benchmarks set by Nike in its fifteen-year sponsorship deals with Ohio State University and the University of Texas, for $252 million and $250 million, respectively.

***The Agreement and its terms.***

17.     Under Armour and UCLA entered into the Agreement in or around May 2016.  Pursuant to the Agreement, Under Armour agreed to provide UCLA with millions of dollars' worth of athletic and athleisure apparel, footwear, accessories, equipment, and fitness products, as well as other financial support over a fifteen-year period.  In exchange, UCLA agreed that Under Armour would provide UCLA with such products on "an exclusive basis" and that UCLA would provide Under Armour with contractually-defined "recognition" for Under Armour's support.

18.     The Agreement contained various terms and conditions, including:

- Term:  The term of the Agreement commenced as of July 1, 2017 and continues for a period of fifteen (15) years, through June 30, 2032.

- "Core Teams":  The phrase "Core Teams" is defined to mean "UCLA's

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

football, baseball, men's basketball, and women's basketball Teams."

▪ <u>Under Armour's Financial Obligations</u>:  Under the Agreement, Under Armour agreed to provide UCLA with financial support totaling at least $280 million, consisting of:  (i) a signing bonus of $15 million; (ii) rights fees in the total amount of $135 million; (iii) a minimum total spend of $15 million on marketing; (iv) $150,000.00 to upgrade and re-brand UCLA's bookstore; (v) a creative services fee of $2 million to re-brand UCLA's athletic facilities; (vi) a total product allowance of $112.85 million; and (vii) bonuses based on the meeting of certain additional criteria.

▪ <u>Under Armour's "Supplied Products" Obligation</u>:  Under Armour was required to provide UCLA with athletic footwear, apparel, accessories, equipment, and other products (defined as "Supplied Products") up to an Annual Product Allowance each year, with a "year" defined as running from July 1 to June 30.  For example, for the period running from July 1, 2020 to June 30, 2021, UCLA was entitled to an Annual Product Allowance of $6.85 million in athletic products.

As the Agreement recognized, much of these products would be customized and highly specific to UCLA and the particular needs of UCLA's student-athletes and staff.  The Agreement also recognized that UCLA needed to receive these products considerably before the first athletic competition in the seasons for which they would be used, including because its athletes and teams would need to test out and get accustomed to any customized gear well in advance of when practice and games begin.  Accordingly, for fall sports, Under Armour agreed that UCLA must receive the customized products that it ordered under its Annual Product Allowance by no later than July 1; for winter sports by no later than October 1; and for spring sports by no later than January 1.  For example, for the 2020-2021 school year, UCLA had ordered the majority of the products to which it was entitled under its $6.85-million Annual Product Allowance by December

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

2019—long in advance of July 1, 2020; and Under Armour agreed that UCLA would receive such products for that year's fall sports by no later than July 1, 2020.

Under Armour also was required to reimburse UCLA for its purchase of certain athletic products that Under Armour could not provide.

▪ <u>Under Armour's "On-Site Representative" and Retail Obligations</u>: Under Armour also promised that it would "provide one (1) full time [Under Armour] employee, solely dedicated to cover, service, and support UCLA at no cost to UCLA, to be located on the UCLA campus in a space provided by UCLA each Contract Year or in a mutually agreeable location within five (5) miles of the main UCLA campus." Under Armour further promised that it would open two retail stores in the Los Angeles area, including making "commercially reasonable" efforts to open one such store in the West Los Angeles area, at which it would prominently feature UCLA-branded products.

▪ <u>UCLA's Obligations</u>: Under the Agreement, UCLA agreed to do just four things: (i) require all of its coaches, staff, and teams "to exclusively wear and use [Under Armour's] Supplied Products … whenever the Coaches, Staff or Teams coach, practice, perform or play in UCLA's intercollegiate athletic program, participate in Team-related activities…, or conduct or participate in exhibitions, on-campus summer camps or clinics on behalf of UCLA"; (ii) provide Under Armour with a certain number of "best-available" tickets and season seats to certain home games, a certain number of post-season game tickets and Olympic Sports Cards, the opportunity to purchase more tickets to certain games, and certain privileges to use hospitality areas; (iii) provide certain signage and advertising for Under Armour at competition and practice venues; and (iv) make UCLA's Head Coaches and the Athletic Director available for appearances, on Under Armour's reasonable request.

▪ <u>Termination for "Material Breach" After Opportunity to Cure</u>: The Agreement provides that Under Armour may terminate the Agreement "[e]ffective

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

upon written notice to UCLA if UCLA breaches any material term of the Agreement and does not cure such breach within thirty (30) days after receiving written notice … from [Under Armour] specifying the breach; however, if the breach is one which cannot reasonably be corrected within thirty (30) days, and [Under Armour] reasonably determines that UCLA is making substantial and diligent progress toward correction during such thirty (30)-day period, this Agreement shall remain in full force and effect for an additional thirty (30)-day period, but may be terminated upon notice thereafter."

▪ <u>Termination for Specifically-Enumerated Reasons After Opportunity to Cure</u>:  The Agreement also provides that Under Armour may terminate the Agreement, among other reasons, if (i) "UCLA ceases for any reason to field a NCAA Division I Core Team or one of those Core Teams does not participate for any reason (other than for a Force Majeure Event) in a complete regular season, missing at least fifty percent (50%) of the scheduled games during the regular season"; or (ii) "[a] Head Coach, senior member of UCLA's Department of Intercollegiate Athletics, Core Team member, or a senior University administrator is convicted of or pleads guilty or no contest to a severe felony (*e.g.*, first degree, aggravated, etc.) …, and following such act, UCLA fails to take reasonably appropriate action(s)"—again, "provided that [Under Armour] has first provided UCLA with thirty (30) days prior written notice specifying its concerns and intent to terminate, and providing UCLA with an opportunity to address [Under Armour's] concerns; however, if the circumstance is one which cannot reasonably be corrected within thirty (30) days but [Under Armour] considers, in good faith, and reasonably determines that it can be cured or corrected within an additional thirty (30) day period, and [Under Armour] reasonably determines that UCLA is making substantial and diligent progress toward correction during such thirty (30)-day period, this Agreement shall remain in full force and effect for an additional thirty

COMPLAINT

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

(30)-day period, but may be terminated upon notice thereafter."

■ "Force Majeure" Clause:  The Agreement provides that "[n]either Party is liable for any breach of its obligations under this Agreement to the extent that the breach resulted from a Force Majeure Event provided that it:  promptly notifies the other Party the nature and cause of the Force Majeure Event and details of how the Party is mitigating its losses in relation to the Force Majeure Event; and [t]akes all reasonable steps to work around, reduce, or mitigate the effects of the Force Majeure Event.  If a Force Majeure Event continues for more than one hundred (100) days, either Party may terminate this Agreement with immediate effect by written notice."  In addition, "[d]elays in delivery, whether resulting from a Force Majeure Event or otherwise, will not change [Under Armour's] obligation to supply late items.  UCLA reserves the right to acquire Supplied Products that are more than thirty (30) days late as a result of a Force Majeure Event from another supplier …, and [Under Armour] will be responsible for all reasonable costs associated with acquiring any such items, which costs shall not be charged against that Contract Year's Annual Product Allowance."

■ "Force Majeure Event":  The Agreement defines a "Force Majeure Event" as a "cause or event" that meets at least two criteria:  (1) it is "is beyond the commercially reasonable control of [Under Armour] (or the reasonable control of UCLA)" and (2) it "renders the performance of this Agreement by the affected Party either impossible or impracticable."  The Agreements provides the following examples of "causes or events" that may constitute a Force Majeure Event:  "flood, earthquake, fire, labor actions or work stoppages, natural calamities, national emergencies, declarations of war, riot, civil disturbance, sabotage, explosions, acts of God, acts of any regulatory, governmental body and/or agency, having jurisdiction over the affected Party, including without limitation any Laws, orders, ordinances, acts, or mandates which prohibit, restrict, or regulate the affected

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603256582.1

9

COMPLAINT

1  Party's performance of its obligations under this Agreement."

2        ***The parties' performance under the Agreement.***

3       19.    At all relevant times through at least June 2020, UCLA met all of its

4  material obligations under the Agreement.  UCLA required its coaches, staff, and

5  teams to exclusively wear and use Under Armour products pursuant to the

6  Agreement.  UCLA also complied with its tickets, signage and advertising, and

7  appearance obligations.

8       20.    In contrast, Under Armour, while performing some of its obligations,

9  did not perform its obligations fully.  For example, Under Armour did not comply

10  with the requirement to provide an on-site Under Armour representative.  And, as of

11  2020, Under Armour failed to be in compliance with its retail store obligation.

12       ***Under Armour's purported termination of the Agreement***.

13       21.    On information and belief, as of June 2020, Under Armour is

14  financially struggling and has been for quite some time.  These struggles long pre-

15  dated the challenges of COVID-19, and even pre-dated Under Armour's

16  negotiations and entering of the Agreement with UCLA in 2016.

17       22.    On information and belief, and unbeknownst to UCLA at the time of

18  the Agreement, Under Armour has been engaging in accounting and disclosure

19  practices designed to manipulate the appearance of its financial health, since at least

20  2015.

21       23.    In November 2019, Under Armour revealed that it was under

22  investigation by the U.S. Securities and Exchange Commission and the U.S.

23  Department of Justice for allegedly engaging in practices to make its financial

24  condition look healthier than it actually was.  On July 27, 2020, Under Armour's 8-

25  K filing revealed that Under Armour, its Executive Chairman Kevin Plank, and CFO

26  David Bergman, each had received a "Wells Notice" notifying them that the SEC

27  would be recommending an enforcement action based on the results of the

28

**Kendall Brill
& Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603256582.1

10

COMPLAINT

1  investigation.

2      24.    According to the 8-K filing, the Wells Notices concern Under

3  Armour's accounting and disclosures for "the ***third quarter of 2015 through the***

4  ***period ending December 31, 2016***"—the precise period of time during which Under

5  Armour was persuading UCLA to enter into the Agreement with it by broadcasting

6  reports of its glowing financial health and staggering growth.  More specifically, the

7  Wells Notices allege that, throughout 2015 and 2016, Under Armour used a "pull

8  forward" tactic—*i.e.*, shifting revenues from sales between financial quarters—in

9  order to enhance the sales reported from quarter to quarter and "meet sales

10 objectives."

11     25.    Under Section IV(A)(7) of the Agreement, Under Armour specifically

12 agreed that "Company shall comply with all applicable laws in effect during the

13 Term."  Under Sections VI(B) and VI(C) of the Agreement, Under Armour had a

14 specific, contractual ongoing obligation to provide accurate financial information to

15 UCLA in its financial statements, in order for "UCLA to evaluate [Under Armour's]

16 financial condition and ability to perform under this Agreement."

17     26.    These contractual provisions reflect an important fact about the

18 Agreement:  it was critically important to UCLA when it entered into the Agreement

19 in 2016, and thereafter during the term of the Agreement, that Under Armour

20 comply with all governing laws, including SEC laws and regulations.  Beyond that,

21 Under Armour's statements about its financial condition and growth (including in,

22 but not limited to, its public financial reporting) was of critical importance to UCLA

23 in deciding to enter into the Agreement and in deciding to maintain Under Armour

24 as a business partner under the Agreement.   Precisely because the Agreement had a

25 fifteen-year term, UCLA needed to be certain that Under Armour would be a

26 reliable partner in meeting that fifteen-year commitment.  Beyond that, as a public

27 institution, UCLA needs to ensure that its business partners comply with the law.

28

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

COMPLAINT

UCLA relied upon Under Armour's reported financial position and its belief that Under Armour had in fact accurately reported its financial position in entering into the Agreement. Had UCLA known that Under Armour was making false financial statements in violation of law and SEC regulation, and falsely reporting its sales reported from quarter to quarter, UCLA would never have entered into the Agreement and/or would have terminated the Agreement at a time when other similarly-attractive sponsorship agreements could have been negotiated for UCLA.

27. Under Armour never disclosed the accounting practices described in the Wells Notices and the 8-K filing, whether before or after UCLA entered into the Agreement. Such disclosure would have been necessary to correct the sin of omission regarding the statements about its financial condition that Under Armour did make (including in its reported financial statements), and make Under Armour's statements about its financial condition complete, true, accurate and non-misleading. Beyond that, by providing false financial statements to UCLA, Under Armour breached its obligations under Sections IV(A)(7), VI(B) and VI(C) of the Agreement.

28. On information and belief, Under Armour also has been mired in other financial quandaries in recent years, including dealing with $1.3 billion in leftover merchandise in 2018; the shrinking popularity of its brand among younger teens; the struggle to break into the women's apparel market; and the fallout from an embarrassing public scandal in late 2018 involving some of its top male executives—including Under Armour's founder, Chairman, and then-CEO Kevin Plank—reportedly expensing trips to strip clubs.

29. In the midst of these various crises, in October 2019, Under Armour's longtime leader, Kevin Plank, announced that he would be stepping down from his position as Under Armour's CEO.

30. More recently, in February 2020, Under Armour admitted that the

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603256582.1

12

COMPLAINT

results for its fourth quarter and 2019 fiscal year had fallen substantially short of analyst expectations, causing Under Armour's share price to plummet.

31.     Under Armour's weakening financial position was not helped by the COVID-19 crisis, which has had severe effects on the economy generally and the world of sports in particular.  While neither COVID-19 nor Under Armour's financial failures prevented Under Armour's performance under the Agreement, on information and belief, these broader problems made complying with the Agreement unattractive for Under Armour.

32.     In mid-April 2020, Under Armour invited UCLA to discuss potentially "shifting" the due date of Under Armour's April payment by a few months, until July 2020, at which time Under Armour stated that it "intended to be caught up on all payments."  Under Armour thanked UCLA for its "partnership and helping Under Armour manage our cash flow during these challenging times."

33.     Just before it hit July, however, Under Armour had changed course.  It decided that it wanted to get out of the Agreement altogether, without paying UCLA what it had promised to pay.  Accordingly, Under Armour conjured a scheme to purport to "terminate" the Agreement in a way that would allow Under Armour to avoid providing UCLA with the financial support that it had promised.

34.     On June 22, 2020, not even three years into its fifteen-year sponsorship, Under Armour announced to UCLA that Under Armour would be terminating the Agreement due to the COVID-19 pandemic.  Under Armour provided *no* prior notice to UCLA of its intent to terminate the Agreement.

35.     In its termination letter to UCLA, Under Armour invoked three grounds for termination.  None of them is legitimate.

36.     *First*, Under Armour purported to invoke the Agreement's "Force Majeure" Clause as the basis for "immediate termination."  Taking great pains to misquote and distort the language of the Agreement, Under Armour claimed that

Kendall Brill
& Kelly LLP

10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603256582.1

13

COMPLAINT

various decisions by the NCAA and Pac-12 to pause certain athletic events due to the COVID-19 pandemic had resulted in a "Force Majeure Event" that relieved all parties of all obligations under the Agreement.  Under Armour further contended that this "Force Majeure Event" had occurred for a total of more than 100 days, justifying its immediate termination of the Agreement, effective June 21, 2020.

37.     That argument ignored the facts, the Agreement, and the law.  Under the Agreement, a "Force Majeure Event" exists as to a party only when there is an event which "renders the performance of this Agreement *by the affected* Party either *impossible or impracticable*." (emphasis added).  That definition, like the law of force majeure and of contractual impossibility and impracticability more broadly, looks not to whether an event has caused general disruption in an industry, or made a pre-existing deal less economically attractive to the affected party, but to whether the event has actually made the performance of a specific contractual obligation by the affected party impossible or impracticable.

38.     Here, Under Armour had no basis for claiming cover under the "Force Majeure" Clause as "the affected Party."  Nothing about COVID-19 made it "impossible or impracticable" for Under Armour to meet its obligations under the Agreement.  Nor did COVID-19 make it impossible or impracticable for UCLA to meet its material obligations under the Agreement.

39.     Under Armour's primary obligations under the Agreement are to provide financial support, including money and products, to UCLA.  Under Armour could and can meet these obligations at all times regardless of COVID-19.  Indeed, UCLA has already ordered, and Under Armour has already provided some of the Supplied Products for fall 2020, regardless of COVID-19.  Beyond that, Under Armour has continued to meet its obligations to other similarly-situated schools and even publicly announced a four-year contract extension of its sponsorship deal with Texas Tech University on June 25, 2020, mere days after purporting to terminate its

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

14

COMPLAINT

Agreement with UCLA.

40.   UCLA, likewise, was performing all of its enumerated obligations under the Agreement regardless of COVID-19, namely, wearing and using Under Armour products and providing Under Armour with the requisite tickets, recognition, and availability of coaches and the Athletic Director, as required by the Agreement.  COVID-19 did not render UCLA's performance impossible or impracticable.  To the contrary, during the COVID-19 pandemic, UCLA's teams and athletes continued to engage in team meetings, voluntary workouts, and other preparations for games, while wearing the Under Armour products that they were then under an obligation to wear on an exclusive basis.  All of that continued and continues to provide ongoing value to Under Armour under the Agreement.

41.   Accordingly, under the plain terms of the Agreement—which are consistent with California law governing impossibility, impracticability, and force majeure—any general disruption caused by COVID-19 and its impact on college athletics was not a "Force Majeure Event."  Under Armour was not entitled to terminate the Agreement simply because COVID-19 caused some disruption for more than 100 days.  Under Armour's mere dislike of the Agreement's economic implications during COVID-19 did not mean that its performance under the Agreement was impossible or impracticable.  Accordingly, Under Armour's first, and primary, reason for invoking termination is clearly prohibited.

42.   **Second**, Under Armour invoked as a ground for termination a provision of the Agreement, Section VIII(C)(2)(c), which would allow Under Armour to terminate in some circumstances if:  (i) "UCLA ceases for any reason to field a NCAA Division I Core Team or one of those Core Teams does not participate for any reason (other than for a Force Majeure Event) in a complete regular season, missing at least fifty percent (50%) of the scheduled games during the regular season."  Under Armour argued that "UCLA's baseball team failed to complete its

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

regular season, playing in only sixteen (16) of fifty-seven (57) games, before its season was cancelled by the NCAA." That argument, too, fails.

43. Section VIII(C)(2)(c) does not apply to the 2020 baseball season at all. The objective intent and plain meaning of Section VIII(C)(2)(c) is that Under Armour may terminate the Agreement if (1) UCLA *itself* for some reason decides to cease "fielding" a "Core Team" (*e.g.*, if UCLA decides to stop having a baseball team); or (2) if UCLA is suspended or barred from participating for some reason in more than half of actually-scheduled games in a "Core Team" sport (*e.g.*, if UCLA were forced to miss otherwise-scheduled games as a sanction for violating NCAA rules).

44. Section VIII(C)(2)(c) also focuses exclusively on UCLA's participation in "scheduled" games. It does not purport to suggest that there is any obligation by UCLA to play in non-existent, cancelled, or "un-scheduled" games, including when the NCAA or Pac-12 has changed the "schedule" of games. That this interpretation reflected the expressed mutual intent of the parties at the time the Agreement was entered into can be shown both by reference to the Agreement's plain meaning and to extrinsic evidence.

45. Here, at all relevant times, UCLA "fielded" all of its Core Teams, including the baseball team and has played in all "scheduled" games. In other words, UCLA has never "ceased" to have a baseball team, and its baseball team has shown up for and played in 100 percent of its "scheduled" games for 2020. That the NCAA or the Pac-12 altered the "schedule" for 2020 baseball games does not change the fact that UCLA has "fielded" its baseball team and played in all "scheduled" games. There is nothing that UCLA failed to do under Section VIII(C)(2)(c) to permit termination by Under Armour under this provision of the Agreement. Thus, Section VIII(C)(2)(c) of the Agreement does not apply at all.

46. Further, on information and belief, Under Armour has not purported to

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603256582.1

16

COMPLAINT

terminate its sponsorship deals with other similarly-situated schools, like Auburn University and the University of South Carolina, even though those deals contain similar "Core Team" requirements.

47.     Alternatively, even if Under Armour's distorted reading of Section VIII(C)(2)(c) were to apply, Under Armour still could not invoke that provision to terminate the Agreement.  As Under Armour's own termination letter admits, UCLA's baseball team was able to play only "sixteen (16) of fifty-seven (57) games" because the rest of "its season was cancelled by the NCAA."  On its face, Under Armour may terminate the Agreement under Section VIII(C)(2)(c) only if UCLA's failure to participate in 50 percent of scheduled games is for a reason "***other than*** for a Force Majeure Event."  Under Armour cannot deny that ***if*** the NCAA's or the Pac-12's partial cancellation of games in the spring 2020 baseball season could be construed to make Section VIII(C)(2)(c) applicable, ***then*** UCLA's non-participation in such cancelled baseball games would have been due to a "Force Majeure Event" that prevented UCLA's performance under Section VIII(C)(2)(c) (because, in that case, the NCAA's or the Pac-12's partial cancellation of the baseball season would have made UCLA's performance under that provision temporarily "impracticable" or "impossible").  In other words, even if UCLA had failed to participate in 50 percent of scheduled baseball games, that failure would have due to a Force Majeure Event—the precise reason that eliminates Section VIII(C)(2)(c) as a basis for termination.

48.     Nor, even if Under Armour's (wrong) interpretation of Section VIII(C)(2)(c) set forth in the preceding Paragraph were to apply, would there have been a "Force Majeure Event" preventing the affected party (UCLA) from performing "***for more than one hundred (100) days***"—the minimum threshold that a "Force Majeure Event" must surpass in order to give rise to a basis for termination.  As Under Armour acknowledges, the UCLA baseball team would have

**Kendall Brill**
**& Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603256582.1

17

COMPLAINT

played, in total, a maximum of 57 games in the 2020 baseball season, if not for the partial cancellation of the season. UCLA's baseball team played 16 games; it did not play 41 games that were cancelled and removed from the baseball schedule by conference rules. Thus, even if the "Force Majeure Event" could conceivably be COVID-19 and/or the NCAA and Pac-12 rules causing UCLA's non-participation in those cancelled baseball games, then the supposed "Force Majeure Event" lasted, at most, only 41 days—*i.e.*, the number of days that baseball team was unable to play in those games. Moreover, UCLA's baseball team played its last scheduled game on March 8, 2020. Before the NCAA and the Pac-12's decision to partially cancel games and thus partially alter the schedule of the 2020 baseball season, the last regular-season baseball game was set to be played on May 23, 2020—again, fewer than 100 days later. Accordingly, even under Under Armour's misreading of Section VIII(C)(2)(c), any supposed "Force Majeure Event" was far from reaching the minimum number of days required to give rise to a ground for termination.[1] For that reason, as well, the abbreviated 2020 baseball season cannot provide a basis for terminating the Agreement, even on the (incorrect) assumption that Under Armour's (incorrect) reading of Section VIII(C)(2)(c) were correct.

49.     ***Third***, Under Armour invoked Section VIII(C)(2)(f) of the Agreement, and claimed that it was entitled to terminate the Agreement because UCLA had failed "to take reasonably appropriate action(s)" following the arrest and indictment of a former UCLA soccer coach in connection with "Operation Varsity Blues" college admissions scandal. There is no basis at all for Under Armour to invoke this provision. Its doing so was purely pretextual. As Under Armour knows, UCLA had placed that coach on leave on the same day as his arrest and promptly accepted his

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

---

[1] Moreover, Under Armour was well aware of this purported Force Majeure Event and UCLA's effort to mitigate it. Under Armour knew that NCAA baseball games had been cancelled due to COVID-19, and Under Armour was equally aware of the efforts made by the NCAA, UCLA, and others to deal with the impact of COVID-19 on college athletics.

603256582.1
18
COMPLAINT

resignation from UCLA a few days later.  Among other reasons, no more "action(s)" could have been "reasonably appropriate" after the coach had resigned.  Nor did Under Armour, at any point prior to the termination letter, ever suggest that these actions were insufficient or demand that UCLA take any other action beyond putting the coach on leave and accepting his resignation.

### *The parties' conduct after the purported* "*termination*."

50.     UCLA received the above-described termination letter from Under Armour on June 22, 2020.  On June 29, 2020, UCLA responded, making the points set forth above.

51.     As UCLA noted in its response, Under Armour's purported "termination" of the Agreement severely disadvantaged UCLA student-athletes, coaches, and staff for the summer of 2020, fall of 2020, the 2020-2021 school year, and beyond.  UCLA had already placed much of its orders for "Supplied Products" from Under Armour for the 2020-2021 school year.  The bulk of the products ordered were customized and UCLA-specific, which is extraordinarily difficult or impossible for UCLA to source on short notice from sources other than Under Armour.  Under the Agreement, delivery of such custom products for all fall sports was due no later than July 1, 2020.  Moreover, the parties had agreed that UCLA would receive its bulk shipment of customized Supplied Products for the 2020-2021 school year on June 22, 2020.  Instead of receiving the athletic products that UCLA had been promised on June 22, however, UCLA received Under Armour's termination letter.

52.     On June 30, 2020, in response to UCLA's letter, Under Armour replied that, "Regarding your demand that the Supplied Products for the 2020-21 school year be delivered immediately, you incorrectly assert that Under Armour refuses to provide those items.  In fact, Under Armour has already shipped some of the Supplied Products, and the balance of Supplied Products ordered by UCLA through

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

the termination date is ready to be shipped."  Under Armour also promised that the Supplied Products that UCLA had already ordered for the 2020-2021 school year "will be shipped."

53.     UCLA relied on that promise by Under Armour to provide all already-ordered Supplied Products for the 2020-2021 school year, regardless of Under Armour's purported termination of the Agreement.  In fact, as UCLA noted in subsequent communications to Under Armour, many of its student-athletes had already returned to campus by early July 2020, and more were returning, pursuant to UCLA's carefully mapped-out "phased" return plan with appropriate safeguards in place, to engage in athletic activities on-campus.  These student-athletes required timely and accurate delivery of athletic products to participate in their respective sports.

54.     Despite Under Armour's promise to provide already-ordered products regardless of the "termination," Under Armour failed to make timely delivery of such products, causing ongoing harm to UCLA and its student-athletes.

55.     UCLA also flagged serious flaws in the gear that had been shipped.  UCLA is relying on Under Armour to provide sufficient and proper already-ordered products for its teams in 2020 and 2021.

56.     On August 12, 2020 (more than seven weeks after Under Armour's termination letter), and after consultation with athletics directors and with the Pac-12 COVID-19 Medical Advisory Committee, the Pac-12 CEO Group voted unanimously to postpone all sport competitions through the end of the 2020 calendar year.  This is not, however, the end of the season for affected fall sports—much less the end of athletic competition at UCLA.  The Pac-12 is currently working on revised schedules for fall sports in 2021, when conditions improve.

57.     While the schedule for sports in fall 2020 has been altered, competition has been postponed, not cancelled.  UCLA remains strongly committed to playing

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603256582.1

20

COMPLAINT

*all* scheduled competitions in each of the "Core Team" sports under the Agreement. Moreover, UCLA will return to athletic competition as soon as the Pac-12 and conditions reasonably so permit.  That the Pac-12 has, due to COVID-19, postponed athletic competitions in the fall of 2020 does *not* mean that Under Armour would have ceased to receive benefits from its sponsorship of UCLA sports in the fall of 2020—to the contrary, Under Armour continues to receive the benefit of its ongoing sponsorship of UCLA.  Moreover, over the twelve remaining years in the term of the Agreement (prior to its termination by Under Armour) Pac-12 competition is certainly expected to resume.

58.     Under Armour has refused to retract its purported termination of the Agreement, and has failed to identify any valid ground for its purported termination of the Agreement.

59.     Under Armour's purported termination of the Agreement is contractually improper, pretextual, and in bad faith.  It will deprive UCLA of hundreds of millions of dollars in payments and financial benefits that Under Armour committed to provide under the Agreement for at least the next twelve years.  Moreover, Under Armour's failure to honor its post-"termination" promise to provide already-ordered goods for the 2020-2021 school year is causing immediate, irreparable, and ongoing harm to UCLA's student-athletes.

## FIRST CLAIM

### (Breach of Contract Under California Law)

60.     UCLA re-alleges and incorporates by reference each of the foregoing paragraphs, as though fully set forth herein.

61.     UCLA and Under Armour entered into a sponsorship agreement (the "Agreement").  At all times relevant to this action, the Agreement was valid and binding.

62.     UCLA has performed all material conditions, covenants, and promises

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

that it was not excused from performing, in accordance with the terms and conditions of the Agreement.

63.     Under Armour's performance of its obligations has not been excused.

64.     Nonetheless, as set forth in part through the examples above, Under Armour has anticipatorily repudiated and actually breached its obligations under the Agreement, including by, *inter alia*, purporting to terminate the Agreement and refusing to comply with its obligations under the Agreement; failing to comply with the contractual provisions dictating the circumstances under which the Agreement may be terminated; failing to provide Under Armour products to UCLA by the agreed-upon, contractual deadlines; purporting to provide UCLA with insufficient, defective, or non-conforming products; failing to pay monies owed to date; failing to pay third-party invoices; renouncing any obligation to pay monies owed in the future; failing to provide an on-site representative; and failing to fulfill its retail store obligations.

65.     As a direct and proximate cause of Under Armour's breaches of the Agreement as alleged herein, UCLA is entitled to recover contractual damages in an amount yet to be determined, but in all events exceeding $200,000,000.00.

## SECOND CLAIM

### (Breach of the Implied Covenant of Good Faith and Fair Dealing Under California Law)

66.     UCLA re-alleges and incorporates by reference each of the foregoing paragraphs, as though fully set forth herein.

67.     UCLA and Under Armour entered into a sponsorship agreement (the "Agreement").  At all times relevant to this action, the Agreement was valid and binding.

68.     Implied in the Agreement is a covenant of good faith and fair dealing, which obligates the contracting parties to act in good faith, to use their best efforts to

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603256582.1

22

COMPLAINT

1  deal fairly with each other, and to avoid impeding the other from obtaining the
2  benefits of the Agreement.

3      69.     UCLA has performed all material conditions, covenants, and promises
4  required to be performed by it in accordance with the terms and conditions of the
5  Agreement.

6      70.     Under Armour's performance of its obligations has not been excused.

7      71.     Under Armour, nevertheless, has wrongfully deprived, impaired, and
8  injured UCLA's enjoyment of its rights, benefits, and full value of the Agreement,
9  including by fabricating a "Force Majeure Event" and disingenuously citing the
10 COVID-19 pandemic as a pretext for its purported termination of the Agreement.
11 Under Armour is aware that neither the COVID-19 pandemic nor any event
12 resulting from the pandemic prevents Under Armour from fully performing its
13 obligations under the Agreement.

14     72.     As a direct and proximate cause of Under Armour's breach of the
15 implied covenant of good faith and fair dealing as alleged herein, UCLA has been
16 damaged in an amount as yet to be determined, but in all events exceeding
17 $200,000,000.00.

18                          **THIRD CLAIM**

19                  **(Promissory Estoppel Under California Law)**

20     73.     UCLA re-alleges and incorporates by reference each of the foregoing
21 paragraphs, as though fully set forth herein.

22     74.     In addition to its contractual obligations under the Agreement, Under
23 Armour made a promise that—regardless of its claim that the Agreement was
24 terminated—under Armour would deliver to UCLA all "Supplied Products" under
25 the Agreement that UCLA had ordered as of June 22, 2020.

26     75.     The relevant promise was clearly made in, *inter alia*, Under Armour's
27 letter of June 30, 2020, in which Under Armour stated that, "Regarding your

28

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603256582.1

COMPLAINT

demand that the Supplied Products for the 2020-21 school year be delivered immediately, you incorrectly assert that Under Armour refuses to provide those items.  In fact, Under Armour has already shipped some of the Supplied Products, and the balance of Supplied Products ordered by UCLA through the "termination" date is ready to be shipped."  Under Armour further promised that such products "will be shipped."

76.    UCLA has detrimentally relied on that promise by, among other things, planning that its student-athletes would be outfitted and equipped for the 2020-2021 school year in Supplied Products already ordered from Under Armour; not obtaining those products from other sources; and encouraging its student-athletes to believe that they will be able to play, practice, and perform on time and on schedule while being appropriately and safely attired and equipped.

77.    Under Armour has breached its promise, by *inter alia*, failing to deliver the Supplied Products it promised to deliver, failing to make timely delivery, and providing non-conforming products.

78.    As a result of Under Armour's breach of its promise, UCLA has suffered actual, reliance, and consequential damages in an amount yet to be determined, but in all events well in excess of $75,000.00.

## **PRAYER FOR RELIEF**

WHEREFORE, UCLA respectfully prays for the following relief:

A.    That judgment be entered in favor of UCLA and against Under Armour;

B.    That UCLA be awarded its damages;

C.    That UCLA be awarded any reasonable attorneys' fees, costs, or other expenses recoverable, including those recoverable pursuant to the Agreement;

D.    That UCLA be awarded interest thereon at the applicable rate under the Agreement; and

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1        E.    That UCLA be granted such other and further relief as the Court may

2    deem just and proper.

3    **DEMAND FOR JURY TRIAL**

4        Plaintiff The Regents of the University of California, on behalf of the

5    Department of Intercollegiate Athletics on its Los Angeles Campus, hereby demands

6    a trial by jury of all issues so triable.

7

8    DATED:  August 26, 2020        KENDALL BRILL & KELLY LLP

9

10

11

12    By:       /s/ Bert H. Deixler

13    Bert H. Deixler (70614)
        bdeixler@kbkfirm.com

14    Nicholas F. Daum (236155)
        ndaum@kbkfirm.com

15    Nary Kim (293639)
        nkim@kbkfirm.com

16    10100 Santa Monica Blvd., Suite 1725

17    Los Angeles, California 90067

18    Telephone: 310.556.2700
      Facsimile:   310.556.2705

19

20    Attorneys for Plaintiff The Regents of the

21    University of California, on behalf of the
      Department of Intercollegiate Athletics on

22    its Los Angeles Campus

23

24

25

26

27

28

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

603256582.1

25

COMPLAINT